~~Sealed~~

FILED by _RM_ D.C.

OCT 2 1 2014

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA – MIAMI

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

UNITED STATES OF AMERICA and
STATE OF FLORIDA *ex rel.*
WILLIAM D. MOREMAN,

        Plaintiffs,

v.

HUMANA, INC., and
HUMANA MEDICAL PLAN, INC.

        Defendants.

# 14-23902

Case No.:

# CIV-COOKE

## FILED UNDER SEAL PURSUANT TO
## 31 US.C. §3730(b)(2)

---

### *QUI TAM* COMPLAINT      / ~~TORRES~~

---

This is an action brought by Plaintiff/Relator William D. Moreman on behalf of the United States of America and the State of Florida for treble damages and civil penalties pursuant to the Federal False Claims Act, 31 U.S.C. § 3729, et seq., and the Florida False Claims Act, Fla. Stat. § 68.081, et seq.  In support thereof, Relator alleges as follows:

### <u>INTRODUCTION</u>

1.       Defendant Humana, Inc. is a managed care organization ("MCO") that fraudulently induced the United States and the State of Florida (hereinafter "the Governments") to enter into a contract for the provision of health care services to Florida Medicaid recipients by promising not to discriminate based on an individual's health status, need for health care services, or geographic location.

2.       In spite of these promises, Humana, Inc. has embarked on a fraudulent marketing scheme, commonly referred to as "cherry picking," which is designed to guarantee that it

provides healthcare services only to the healthiest and least expensive of Medicaid eligible individuals.

3.      Compliance with federal regulations and applicable contract provisions which prohibit discrimination against Medicaid beneficiaries based on cost, health status, or geographic location is a condition material to payment under federal law.

4.      As a result, Defendants knowingly presented, or caused to be presented, false claims for payment or approval for payment by the Governments and/or knowingly made, used, or caused to be made or used false records or statements to get false or fraudulent claims paid or approved by the Governments.

5.      Defendants' ongoing conduct has harmed the Governments by causing them to make millions of dollars in fraudulently inflated capitation payments from at least September 2014 to the present.

## JURISDICTION AND VENUE

6.      This action arises under the Federal False Claims Act, 31 U.S.C. §§ 3729 – 3732, and the Florida False Claims Act, Fla. Stat. §§ 68.081 – 68.092.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1345, 28 U.S.C. § 1367 and 31 U.S.C. §3732(a), which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.  Additionally, 31 U.S.C. § 3732(b) specifically confers jurisdiction on this Court for state-law claims that arise under the same transactions or occurrences as an action brought under 31 U.S.C. § 3730.

7.      This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, because the Defendants can be found

in, reside in, and transact business in Miami-Dade County, which is in the Southern District of Florida.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because the Defendants can be found in, reside in, and transact business in the Southern District of Florida, and the alleged discriminatory acts occurred in this District.

9.      Relator knows of no other complaints that have been filed against Defendants alleging the same or similar allegations.  Relator is an original source as defined by the Federal False Claims Act in 31 U.S.C. § 3730(e)(4)(B) and the Florida False Claims Act in Fla. Stat. § 60.087(3) and as described more fully herein.  Relator has made voluntary disclosures to the United States of America and the State of Florida prior to the filing of this lawsuit as required by 31 U.S.C. § 3730(b)(2).

### PARTIES

10.      Relator William D. Moreman is a resident of Tampa, Florida and is employed as Humana Health Insurance of Florida's Medicaid Market Director for its marketing division, which is called Market Point.  He is currently Humana, Inc.'s only Medicaid marketing director in Florida.  From 2007 to 2013, Relator was the Associate Vice-President and Plan Compliance Officer for Amerigroup Florida, Inc. ("Amerigroup").  At Amerigroup, Relator was responsible for overseeing a Corporate Integrity Agreement imposed after Amerigroup paid the United States Government $225 million to settle a false claims action for engaging in discriminatory marketing practices.

11.      Defendant Humana, Inc. is a Louisville, Kentucky-based for-profit American managed health care company that markets and administers health insurance in the United States. Humana Inc. has over 13 million customers in the United States.  Its reported income in 2013

was $1.2 billion based upon $41.3 billion in revenue.  It is a Delaware corporation with over 52,000 employees.

12.     Defendant Humana Medical Plan, Inc. ("Humana Medical") is a Florida corporation formed on 8/12/1986 and is a wholly owned subsidiary of Humana, Inc.

13.     Humana, Inc. and Humana Medical Plan, Inc. will collectively be referred to as "Humana" or "Defendants."

## A BRIEF OVERVIEW OF FLORIDA MEDICAID:
## A FEDERAL- AND STATE-FUNDED GOVERNMENT HEALTHCARE PROGRAM

14.     Medicaid is a joint federal- and state-funded program that provides healthcare coverage and benefits for certain groups of individuals, primarily the poor and disabled.  Florida Medicaid is regulated by the Florida Agency for Health Care Administration and includes federal government oversight through the Centers for Medicare and Medicaid Services ("CMS"). Florida Medicaid serves approximately 3.2 million people and had estimated expenditures of $20.3 billion for FY2011-2012.

15.     The Social Security Act provides for open-ended federal matching for a state's Medicaid program.  The amount varies year to year based on a program called the Federal Medical Assistance Percentage and a state-specific multiplier.  The following figures represent the applicable FMAP for Florida for FY2008 through 2013:

| Fiscal Year | Federal Share | State Share |
|---|---|---|
| FY2008 | 56.83% | 43.17% |
| FY2009 | 67.64% | 32.36% |
| FY2010 | 67.64% | 32.36% |
| FY2011 | 55.45% | 44.55% |
| FY2012 | 56.04% | 43.96% |
| FY2013 | 58.08% | 41.92% |

16.     Medicaid coverage is set forth in Florida Statutes § 409.901, *et seq*.  Mandatory Medicaid-covered services include, *inter alia*, hospital inpatient services, hospital outpatient

4

services, independent laboratory services, physician services and therapeutic services for children. Fla. Stat. § 409.905. Mandatory services made up $9.4 billion of the expected $20.3 billion expenditures for FY2012. There are typically no coverage limits for individuals under 21 years of age. *Id.*; Fla. Stat. 409.906.

17.     The federal government has authorized state agencies to enter into contracts with managed care organizations to provide health care services to Medicaid beneficiaries. Under these Medicaid managed care programs, a health plan is paid a predetermined payment per enrollee, per month, for the covered health care services. The amount of this monthly payment is referred to as a "capitation rate."

18.     The capitation rate is based on an age/gender category and on actuarial studies of the Medicaid population. This capitation rate assumes that a percentage of the MCO's enrollees will be more expensive to treat than others, and conversely, that many of these enrollees will be less expensive. As Florida Medicaid Director Justin Senior explained, "when you have a large population, you have an opportunity to spread risk….If you have some patients that are very expensive, it won't break the plans' bank."

19.     In return for the capitation payments, the MCO then provides a range of medical and hospital services to its Medicaid-beneficiary members.

20.     Medicaid managed care organizations constitute a class of participating "providers" under applicable federal law. 42 U.S.C. §1396b(m) defines the duties and functions of Medicaid MCOs and these provisions are implemented principally through 42 C.F.R. § 438. MCOs may not discriminate against providers "that serve high-risk populations or patients that require costly treatment," and must comply with any additional provider selection criteria imposed by a State. 42 C.F.R. § 438.214(c), (e).

5

21.    Enrollment discrimination against individuals based on their health care status and needs is prohibited by 42 U.S.C. § 1396b (m)(2)(A)(v).  Plans that discriminate are subject to sanctions under 42 U.S.C. § 1396b(m)(2)(A) & (5)(A) & (B). MCOs also "must comply with any additional requirements established by the State" in this area. 42 C.F.R. § 428.214(e).

## DEFENDANTS' WRONGFUL CONDUCT COMMON TO ALL COUNTS

22.    In February 2014, Humana entered into a contract (the "Contract")[1] with Florida's Agency for Health Care Administration ("AHCA") to provide health services to Florida Medicaid recipients located within certain designated geographical areas.  Pursuant to Florida Statute 409.966(2), Florida's sixty-seven (67) counties are divided into eleven (11) Regions, which are commonly referred to as "Service Areas."

23.    These Regions are designated as follows:

| Region | Counties |
|--------|----------|
| 1 | Escambia, Okaloosa, Santa Rosa, Walton |
| 2 | Bay, Calhoun, Franklin, Gadsden, Gulf, Holmes, Jackson, Jefferson, Leon, Liberty, Madison, Taylor, Wakulla, Washington |
| 3 | Alachua, Bradford, Citrus, Columbia, Dixie, Gilchrist, Hamilton, Hernando, Lafayette, Lake, Levy, Marion, Putnam, Sumter, Suwannee, Union |
| 4 | Baker, Clay, Duval, Flagler, Nassau, St. Johns, Volusia |
| 5 | Pasco and Pinellas |
| 6 | Hardee, Highlands, Hillsborough, Manatee, Polk |
| 7 | Brevard, Orange, Osceola, Seminole |
| 8 | Charlotte, Collier, DeSoto, Glades, Hendry, Lee, Sarasota |
| 9 | Indian River, Martin, Okeechobee, Palm Beach, St. Lucie |
| 10 | Broward |
| 11 | Miami-Dade, Monroe |

---

[1] Relevant excerpts of the Contract are attached as Exhibit A.

24.     The Contract authorizes Humana to service Regions 1, 6, 9, 10, and 11. The below chart lists the number of eligible Medicaid enrollees in each of these Regions by age and county as of June 30, 2014:

| Age/ County | 0-5 | 6-10 | 11-18 | 19-20 | 21-35 | 36-59 | 60-64 | 65-74 | 75-84 | 85+ | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Escambia | 13,651 | 9,837 | 11,697 | 1,576 | 9,780 | 10,129 | 1,819 | 2,939 | 1,656 | 941 | 64,025 |
| Okaloosa | 6,400 | 4,392 | 4,703 | 627 | 4,299 | 3,826 | 596 | 1,016 | 628 | 406 | 26,893 |
| Santa Rosa | 4,478 | 3,347 | 4,158 | 518 | 3,150 | 3,320 | 546 | 925 | 561 | 273 | 21,276 |
| Walton | 2,219 | 1,469 | 1,657 | 223 | 1,350 | 1,416 | 264 | 429 | 217 | 92 | 9,336 |
| Total Area Region 1 | 26,748 | 19,045 | 22,215 | 2,944 | 18,579 | 18,691 | 3,225 | 5,309 | 3,062 | 1,712 | 121,530 |
| | | | | | | | | | | | |
| Age/ County | 0-5 | 6-10 | 11-18 | 19-20 | 21-35 | 36-59 | 60-64 | 65-74 | 75-84 | 85+ | TOTAL |
| Hardee | 1,935 | 1,451 | 1,699 | 199 | 915 | 804 | 170 | 386 | 218 | 79 | 7,856 |
| Highlands | 4,151 | 3,281 | 3,876 | 489 | 2,751 | 2,811 | 564 | 1,239 | 869 | 392 | 20,423 |
| Hillsborough | 60,497 | 42,521 | 52,680 | 6,802 | 37,537 | 36,049 | 6,138 | 14,645 | 8,872 | 4,135 | 269,876 |
| Manatee | 12,964 | 9,735 | 10,676 | 1,215 | 6,817 | 6,673 | 1,159 | 2,627 | 1,494 | 909 | 54,269 |
| Polk | 30,574 | 22,909 | 27,924 | 3,440 | 19,478 | 18,364 | 3,310 | 7,107 | 4,059 | 2,021 | 139,186 |
| Total Area Region 6 | 110,121 | 79,897 | 96,855 | 12,145 | 67,498 | 64,701 | 11,341 | 26,004 | 15,512 | 7,536 | 491,610 |
| | | | | | | | | | | | |
| Age/ County | 0-5 | 6-10 | 11-18 | 19-20 | 21-35 | 36-59 | 60-64 | 65-74 | 75-84 | 85+ | TOTAL |
| Indian River | 4,684 | 3,479 | 4,106 | 485 | 2,699 | 2,892 | 482 | 1,127 | 724 | 430 | 21,108 |
| Martin | 4,128 | 2,752 | 3,024 | 329 | 1,769 | 1,965 | 336 | 824 | 540 | 450 | 16,117 |
| Okeechobee | 2,344 | 1,770 | 2,036 | 233 | 1,288 | 1,339 | 231 | 516 | 268 | 135 | 10,160 |
| Palm Beach | 48,618 | 33,151 | 38,493 | 4,234 | 22,991 | 22,395 | 3,893 | 13,231 | 8,934 | 4,995 | 200,935 |
| St. Lucie | 12,293 | 8,884 | 11,038 | 1,254 | 7,332 | 7,528 | 1,162 | 2,809 | 1,789 | 924 | 55,013 |
| Total Area Region 9 | 72,067 | 50,036 | 58,697 | 6,535 | 36,079 | 36,119 | 6,104 | 18,507 | 12,255 | 6,934 | 303,333 |
| | | | | | | | | | | | |
| Age/ County | 0-5 | 6-10 | 11-18 | 19-20 | 21-35 | 36-59 | 60-64 | 65-74 | 75-84 | 85+ | TOTAL |
| Broward | 72,753 | 46,624 | 57,842 | 6,622 | 34,598 | 34,510 | 6,402 | 23,260 | 16,035 | 7,182 | 305,828 |
| Total Area Region 10 | 72,753 | 46,624 | 57,842 | 6,622 | 34,598 | 34,510 | 6,402 | 23,260 | 16,035 | 7,182 | 305,828 |
| | | | | | | | | | | | |
| Age/ County | 0-5 | 6-10 | 11-18 | 19-20 | 21-35 | 36-59 | 60-64 | 65-74 | 75-84 | 85+ | TOTAL |
| Miami-Dade | 121,835 | 83,756 | 113,129 | 13,471 | 66,207 | 78,616 | 17,054 | 80,452 | 60,631 | 27,119 | 662,270 |
| Monroe | 2,073 | 1,096 | 1,309 | 178 | 998 | 1,292 | 312 | 785 | 323 | 142 | 8,508 |
| Total Area Region 11 | 123,908 | 84,852 | 114,438 | 13,649 | 67,205 | 79,908 | 17,366 | 81,237 | 60,954 | 27,261 | 670,778 |
| | | | | | | | | | | | |

25.     According to the Contract, AHCA pays Humana a fixed monthly payment for each individual enrolled in the program.  These capitation payments depend, in part, on the age and gender of each member.  Once a Medicaid beneficiary is enrolled with Humana, AHCA then pays the applicable capitation rate for each enrollee.

26.     Federal and state law requires contracts between AHCA and MCOs contain provisions prohibiting discrimination against enrollees.  These prohibitions were expressly included in the Contract.  Specifically, the Contract stated that Humana "shall not discriminate on the basis of…health status, pre-existing condition or need for health care services and shall not use any policy or practice that has the effect of such discrimination." (Contract at p.36).

27.     The Contract also requires that Humana not market its enrollment plan, nor distribute any marketing materials, in a manner that discriminates based on "gender, age, mental or physical disability, actual or perceived health status, claims experience, medical history, genetic information, evidence of insurability or geographic location." (Contract at p.51). Additionally, Humana is required to distribute its marketing materials to the entire region it serves.  (Contract at p.57).

28.     The Contract further prohibits Humana from discriminating "against particular providers that serve high-risk populations or specialize in conditions that require costly treatments." (Contract at p.103).

29.     Pursuant to the Contract, Humana must report on a quarterly basis a "comprehensive fraud and abuse prevention activity report regarding its investigation, preventative and detective activity efforts[.]" (Contract at p. 165). This report must include, among other things, the dollar amount of Humana's losses and recoveries attributable to

8

overpayment, fraud, and abuse.  Both federal regulations and the Contract require Humana to certify that "all data submitted in conjunction with the reports and all documents requested by [AHCA] are accurate, truthful and complete" and "shall submit its certification at the same time it submits the certified" quarterly reports.  *See* 42 C.F.R. §§ 438.604, 608.

30.     "Abuse" is defined in the Contract as "[p]rovider practices that are inconsistent with generally accepted business or medical practices and that result in an unnecessary cost to the Medicaid program…." (Contract at p. 4).  "Fraud" is defined as "An intentional deception or misrepresentation made by a person with the knowledge that the deception results in an unauthorized benefit to that person or another person.  The term includes any act that constitutes fraud under applicable federal or state law."  (Contract at p.14).

31.     Florida law similarly requires that each Medicaid managed care plan adopt an "anti-fraud plan addressing the detection and prevention of overpayments, abuse, and fraud relating to the provision of and payment for Medicaid services and submit the plan to the Office of Medicaid Program Integrity within the agency for approval."  *See* Fla. Stat. §409.91212(1).

**Defendants' Discriminatory Marketing Plan**

32.     Federal law (*see, supra* ¶¶ 20,21) prohibits MCOs from implementing marketing and enrollment practices which discriminate against federal health care program beneficiaries on the basis of race, gender, health status, or geographic location.

33.     Similarly, federal regulations require managed care entities to distribute marketing materials to the entire service area of such entity covered under the contract.  42 U.S.C 1396u (d)(2)(B).

34.     In its Guidelines for Addressing Fraud and Abuse in Medicaid Managed Care, the Centers for Medicare and Medicaid Services ("CMS") identifies "cherry picking" as a form of

9

enrollment fraud.  According to these guidelines, "cherry-picking" is defined as "selecting the healthiest segment of the enrollment population" and an MCO that engages in this fraudulent activity is trying to assure "itself of higher profits by having to make fewer payments to its provider."

35.     These Guidelines specifically include "distribution of marketing materials in locations where only 'healthy' potential enrollees are likely to access them" as an example of "cherry-picking."

36.     CMS warns that "cherry-picking" is difficult to control and that "individuals who are most ill thus find it difficult to get adequate care, especially in those rural areas where few MCOs exist."

37.     Humana has launched a fraudulent and discriminatory marketing scheme designed to ensure that it avoids enrolling unhealthy Medicaid patients who are more costly to treat and will erode the company's profit margin, and thus, discriminates against particular providers that serve high-risk populations or specialize in conditions that require costly treatments. *See, ¶28, supra.*

38.     In July 2014, Defendant began an "in-store" marketing initiative for certain check cashing stores located in south Florida, whereby an individual who cashes a check at a store would be provided money in a jacket branded with a Humana advertisement.  Because he is Humana's Medicaid Market Director, Relator was included in discussions concerning this initiative.

39.     The marketing plan was to be implemented at up to sixty (60) locations, and Humana estimated that campaign would impact 2,000 potential Medicaid enrollees per month at each location.

40.     On July 20, 2014, Defendants' Regional Market President, Dr. Fernando Valverde sent an email to several Humana employees, including Relator, with the subject matter "Check Cashing."  In the email, Dr. Valverde stated "[w]hile we figure out what to do with HC I think we move forward in MDC and Broward County alone (not PB) and within the first 2 counties avoid certain zipcodes (i.e. high hospital cost areas).  Agree?"

41.     Later that same day, Heidi Garwood, Humana's Executive Director for the Florida Medicaid Programs responded by email, stating she agreed with Dr. Valverde's recommendation.

42.     In a subsequent email sent to Garwood, Dr. Valverde and Relator (among others), Humana's Senior Director of Operations and Business Development, Neil Berman, directed that the  "Check Cashing" marketing proposal only include "Miami-Dade and Broward locations for South Florida.  Prepare a zip code map with the locations and then review with Finance to eliminate any identified locations in a high cost Hospital Areas (sic)."  Berman further stated that the plan cannot include Palm Beach County.

43.     Dr. Valverde followed up by emailing Humana Vice President Randee Lehrer "what pockets of Miami Dade and Broward should we avoid when considering marketing to MMA populations based on the high cost of hospitals?  Memorial Regional? What else?"  Valverde later advised that "[a]s you know the MMA population are high utilizers of ERs."

44.     Lehrer responded by preparing a spreadsheet of various healthcare facilities so that "we can plan on which facilities to avoid."  In a July 28, 2014 email, Lehrer identified (by region) the "hospitals to stay away from (the most expensive)...."

| Region 9 | Region 10 | Region 11 |
|---|---|---|
| JFK Medical Center | North Broward Medical Center | Miami Children's |
| St. Mary's | Broward | Jackson |

|  | General | Memorial |
|---|---|---|
|  | Imperial Point | Homestead Hospital |
|  | Each Memorial facility (except Pembroke) | Baptist Hospital of Miami |
|  |  | Mariners Hospital |
|  |  | University of Miami Hospital |

45.     During his employment with Humana, Relator attended a meeting in Miramar, Florida with senior-level Humana employees in which he expressed concern that certain conduct by Humana may be in violation of applicable regulations or be otherwise unethical.  In response, Humana's Regional Vice-President, Richard Purdy, told him "take off your compliance hat," which Relator understood to mean that he needed "get with the program" or face the consequences.

46.     Similarly, in early 2014, Relator had an impromptu one-on-one meeting with Dr. Valverde in Miramar in which Valverde discussed a marketing initiative. Relator advised Dr. Valverde that his marketing initiative could not proceed because AHCA had not authorized it. Just a couple of days after this meeting, Humana's Regional Director, Lou Sessa, phoned Relator and discussed Relator's previous meeting with Dr. Valverde.  Sessa admonished Relator that he "needs to learn to be more flexible," which Relator interpreted to mean that he needs to be concerned with effective marketing—not compliance.

47.     As a result of these meetings, Relator has been concerned that his employment would be jeopardized should he voice his concerns about Dr. Valverde's discriminatory marketing plan to any of his superiors.

48.     Based upon Relator's prior experience overseeing Amerigroup's compliance with its Corporate Integrity Agreement (*see*, ¶10, *supra*) , he immediately recognized that Humana's marketing plan violated regulatory and contractual provisions which prohibit discriminatory marketing initiatives.

49.     Humana implemented this discriminatory marketing plan on September 3, 2014. The locations where the plan is being implemented are identified in Exhibit B.  Humana began receiving inflated capitation payments for a total of 258,071 enrollees on September 27, 2014.

## DEFENDANTS SUBMITTED, OR CAUSED TO BE SUBMITTED, FALSE CLAIMS TO THE GOVERNMENTS

50.     As a condition for receiving payments under the Medicaid managed care program, Defendants must comply with the applicable certification requirements of 42 CFR §438.602, *et seq*, and requirements not discriminate.  Payments would not have been made by the Governments if the Governments were aware that Defendants had submitted false certifications and engaged in discriminatory practices.

51.     Humana induced the Governments to execute the Contract by falsely representing that it would not discriminate on the basis of health status and geographic location while it concocted a marketing plan that specifically identified for exclusion certain Medicaid populations and healthcare providers.  The Governments would not have agreed to the Contract had they known that Humana intended to engage in discriminatory marketing practices.

52.     As a condition for receiving payment under the Medicaid managed care program, Humana must certify compliance with federal regulations and the Contract.  Humana materially violated those regulations and the Contract by implementing the discriminatory marketing plan

described herein.  As such, any certification of compliance with the regulations and Contract is necessarily false.

53.     Accordingly, each enrollment application submitted to AHCA constitutes a false claim because it seeks the payment of capitation rates that Humana knows are inflated.

54.     Additionally, these enrollment applications caused AHCA to submit additional forms to the federal government, including CMS Forms 37 and 64 (attached as Composite Exhibit C) which expressly certified these expenditures were in compliance with federal laws and regulations.  These certifications were likewise false.

55.     Humana is also required to disclose fraud and abuse (*see*, *supra*, ¶¶ 29-31).  On at least a quarterly basis, Humana falsely certifies to AHCA that it has not identified any fraud or abuse pertaining to its marketing activities by failing to disclose the ongoing fraudulent scheme detailed herein.

56.     The Governments would not have made any payments to Humana if they were aware that the certifications described above were false.

### COUNT I

### (Violations of the Federal False Claims Act, 31 U.S.C. § 3729(a))

57.     Relator incorporates paragraphs 1 – 56 of this complaint as though fully set forth herein.

58.     As described above, Defendants have submitted and/or caused to be submitted false or fraudulent claims to Medicaid.

59.     In doing so, Defendants have violated:

(1)     31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval; and/or

(2)      31 U.S.C. § 3729(a)(1)(B) by knowingly making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim; and/or

(3)      31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

60.      To the extent any of the conduct alleged herein occurred on or before May 20, 2009, Relator alleges that Defendants knowingly violated 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(2); and 31 U.S.C. § 3729(a)(7) prior to amendment, by engaging in the above-described conduct.

61.      Because of the false or fraudulent claims made by Defendants, the United States has suffered, and continues to suffer damages.

## COUNT II

### (Violations of Florida False Claims Act, Fla. Stat. § 68.082)

64.      Relator realleges incorporates paragraphs 1 - 56 of this complaint as though fully set forth herein.  This count sets forth claims for treble damages and forfeitures under the Florida False Claims Act, Fla. Stat. § 68.081, et seq.

65.      Defendants certified and continue to certify that they will comply with all applicable federal and state regulations.  As described above, Defendants have engaged in false or fraudulent activities by engaging in a marketing plan designed to discriminate against Medicaid recipients based upon health status and geographic location.

66.      Defendants know that certifying they have complied with all state and federal regulations is false and that the federal regulations prohibited the State of Florida from receiving reimbursement for these services.  Defendants also know that the State of Florida would not make a payment for any claim which was not reimbursable by the federal government in

accordance with the Federal Medical Assistance Percentage.  Still, Defendants submitted claims to the Florida Agency for Health Care Administration (AHCA) for reimbursement.

67.     But for Defendants' false certifications and statements of compliance with the federal and state regulations and the Contract, the State of Florida would not have paid any portion of the claims made by Defendants.  Therefore, Defendants made false claims which damaged the State of Florida in the amount of the state share of every claim submitted.

68.     In doing so, Defendants knowingly violated:

(1)     Fla. Stat. § 68.082(2)(a) by knowingly presenting or causing to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval; and

(2)     Fla. Stat. § 68.082(2)(b) by knowingly making, using or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency; and

(3)     Fla. Stat. § 68.082(2)(g) by knowingly making, using, or causing to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to an agency of the State of Florida.

69.     Because of the false or fraudulent claims made by Defendants, the State of Florida has suffered, and continues to suffer damages and is therefore entitled to recovery as provided by the Florida False Claims Act of an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## PRAYER

WHEREFORE, Relator William D. Moreman, on behalf of the United States of America and the State of Florida, requests:

a.     That Defendants be ordered to cease and desist from submitting and/or causing the submission of additional false claims or otherwise violating 31 U.S.C. § 3729, *et seq.*; and

b.      That Defendants be ordered to cease and desist from submitting and/or causing the submission of additional false claims or otherwise violating Fla. Stat. 68.081, *et seq*.; and

c.      That judgment be entered in favor of the United States of America, the State of Florida, and Relator and against the Defendants in the amount of each and every false or fraudulent claim multiplied as provided by 31 U.S.C. § 3729 and Fla. Stat. 68.082(2), plus a civil penalty of not less than $5,500 and no more than $11,000 per claim, to the extent such multiplied penalties shall fairly compensate the United States of America and the State of Florida for losses resulting from the various schemes undertaken by the Defendants, together with penalties for additional specific claims to be identified at trial after full discovery; and

d.      That Relator be awarded the maximum amount permissible according to 31 U.S.C. § 3730 (c) and Fla. Stat. 68.085; and

e.      That judgment be granted for the United States of America, the State of Florida and Relator for all violations by the Defendants of the Federal False Claims Act, the Florida False Claims Act, and all other applicable laws referenced herein; and

f.      That judgment be granted for the United States of America, the State of Florida and Relator and against all Defendants for any costs, including but not limited to court costs, expert fees and all attorneys' fees incurred by Relator in the prosecution of this case; and

g.      That the United States of America, the State of Florida and Relator be granted such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

A jury trial is requested for all issues so triable.

Respectfully submitted,

CHRISTOPHER CASPER
Fla. Bar No. 048320
ccasper@jameshoyer.com
**JAMES, HOYER, NEWCOMER &
SMILJANICH, P.A.**
4830 W. Kennedy Blvd.
One Urban Centre, Suite 550
Tampa, FL   33609
Tel.  813-397-2300
Fax  813-397-2310

**Counsel for Relator**

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the above and foregoing has been furnished by Certified Mail, Return Receipt Requested, this 21ˢᵗ day of October, 2014 to the following:

The Honorable Eric H. Holder, Jr.
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C.  20530-0001

Wifredo A. Ferrer, United States Attorney
United States Attorney's Office
U.S. Attorney's Office - Miami
99 N.E. 4th Street
Miami, Fl. 33132

The Honorable Pam Bondi
Attorney General of Florida
The Capitol, PL 01
Tallahassee, FL  32399

Jeff Atwater
Chief Financial Officer
Florida Department of Financial Services
200 East Gaines Street
Tallahassee, FL  32399-0300

CHRISTOPHER C. CASPER